AFFIDAVIT

I, Charles Winn, depose and state the following:

1. I am currently employed as a Vermont State Trooper assigned to the Northeast Vermont Drug Task Force. I have been a Trooper since 2008 and have served with the Drug Task Force since March 2014. During the course of my employment with the Vermont State Police, I have participated in numerous drug arrests, including arrests involving heroin.

2. I submit this affidavit in support of a federal criminal complaint against Gregory E. Herman and Francis L. Putney for possession with intent to distribute heroin and aiding and abetting the possession of heroin with intent to distribute, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C) and 18 U.S.C. § 2.

3. The information included in this affidavit comes from my own observations and training and experience as a law enforcement officer, as well as my conversations with and review of an affidavit prepared by Trooper Richard Slusser who conducted the vehicle stop described herein.

4. My review of Trooper Slusser's affidavit and my conversation with him about the events in question provided the following information:

a. On April 15, 2015, at approximately 1:20 p.m., while traveling northbound on I-89 in Royalton, Windsor County, Vermont, in a fully marked State Police cruiser, Trooper Slusser observed a black Toyota pickup truck also traveling northbound ahead of him. He observed this vehicle to be traveling faster than the posted speed limit of 65 mph, and specifically received a reading of 77 mph on his RADAR unit.

b. Trooper Slusser activated his emergency blue lights to initiate a traffic stop based on a violation of Title 23 VSA 1004 (article 1.1 speed limits). Trooper Slusser observed the vehicle

1

signal its intention by activating the right turn signal. Trooper Slusser observed the vehicle took longer than normal to come to a stop compared to thousands of car stops he had either made or been involved with.

c. Trooper Slusser approached the vehicle on the driver's side and met with the two occupants, later identified as driver Francis Putney and passenger Gregory Herman. Trooper Slusser advised them of his identity and the reason for the stop. The driver advised he did not have his license on him but knew his license number. Trooper Slusser observed that the driver's hand trembled more than would be normal for a routine traffic stop when the driver handed over his registration. Trooper Slusser also noticed the driver's heart beating excessively fast and hard through his shirt.

d. Trooper Slusser asked the driver to get out of the vehicle as the driver had no ID, but advised him he was not required to do so. The driver consented and accompanied Trooper Slusser to his cruiser. Trooper Slusser told the driver prior to entering the cruiser that Trooper Slusser wanted to search him and that he did not have to allow it. The driver consented to a search of his person. Nothing of interest was found.

e. Once inside the cruiser, Trooper Slusser began to take enforcement action in the form of a written warning (as opposed to a ticket). The driver identified himself as Francis Putney and provided a date of birth. Trooper Slusser observed Putney to be overly talkative. Based on his training in body language and prior experience, Trooper Slusser knew people sometimes show signs of nervousness by being overly talkative and talk about subjects that are "safe" for them.

f. Putney advised Trooper Slusser that the passenger (later identified as Gregory Herman) had family in Vermont. Trooper Slusser asked Putney why Herman's family couldn't come pick him up, and Putney was unsure and then said something about them not driving. Putney then

2

advised he saw Herman a month ago. Putney then went back to a safe subject and told Trooper

Slusser he knew a lot of Troopers from the Middlesex Barracks as he does towing for VSP.

Putney then advised he thought his speed was around 70 mph. Trooper Slusser asked Putney

where Herman's family was. Putney responded  he didn't know and that he just drops Herman

off in Barre and Herman walks. Putney appeared to struggle with this answer and rambled on for

a time. Putney then talked about the Alaska State Troopers K9 team. Trooper Slusser handed

Putney his information back and asked if there was anything illegal in the vehicle. Putney said

"nothing that I'm aware of."

      g.  Trooper Slusser asked Putney if Putney had a problem with Trooper Slusser searching

the vehicle. Putney initially paused and then advised he didn't have a problem. Putney then

asked if Trooper Slusser had a reason to do so.

      h. Trooper Slusser is currently assigned as a K9 handler for the Traffic Operations Unit.

His K9 (Drager) has been certified by the Vermont Criminal Justice Training since April 2010,

for narcotics/drug detection. Drager has located in excess of 1 million dollars' worth of illegal

drugs since being certified. Drager is certified to detect the presence of the following narcotic

and drug odors: Marijuana, Hashish, Cocaine, Crack Cocaine, Heroin, Methamphetamine,

Ecstasy and any of these narcotic and/or drug odors on currency. During Drager's narcotics and

drug detection class and regular in service training, the K9 has executed over 1000 successful

searches. The majority of these were for actual narcotics or drugs placed by the trainer and

random discrimination searches where the search area had no narcotics or drugs. Drager has an

approximate proficiency rating during all of those searches of 99%.

i. Trooper Slusser deployed his K9 on the vehicle and commanded him to search for drugs. Trooper Slusser observed when Drager went up the passenger side from the rear, Drager alerted to the presence of drugs at the front passenger door handle.

j. Trooper Slusser put Drager back in the cruiser and began to talk again with Putney. Putney immediately began talking about dogs again. Trooper Slusser found this strange as he believed Putney had just observed Drager alert to Putney's vehicle. Trooper Slusser asked Putney if people maybe smoke marijuana in the vehicle and Putney said probably his brother. Trooper Slusser then read off a DPS 245B consent to search (probable cause side)[1] and handed it to Putney to read and comprehend, and sign if he agreed. Putney stared blankly at the card for a time, and then signed it granting consent to search.

k. Trooper Slusser went back to the vehicle and spoke with the passenger Gregory Herman. Herman advised he had two bags in the vehicle, a red bag on the back seat and a paper shopping bag at his feet. Trooper Slusser asked Herman to step out of the vehicle and Herman agreed. Once out of the vehicle, Trooper Slusser sought Herman's consent to search using the consent to search card (probable cause side). Trooper Slusser indicated to Herman that Trooper Slusser wanted to search everything in the vehicle and everybody in it. Trooper Slusser further informed Herman he did not have to allow it and that Trooper Slusser would seize everything and apply for a search warrant that might or might not be granted in the absence of consent. Herman consented.

---

[1] The VSP consent card is printed with two sets of warnings. The first requests consent in the absence of otherwise existing probable cause to search the vehicle. The second, the "probable cause side," requests consent to search and includes a statement that if the person does not consent to the search, the officer will seek to obtain a warrant to search the requested item which may or may not be granted by a judge.

4

l. Trooper Slusser searched Herman. Inside Herman's front right pants pocket, Trooper Slussman located a napkin which contained a half of a marijuana cigarette. Nothing else of interest was found. Trooper Slusser again checked with Herman on his possessions (2 bags) in the vehicle and again told Herman that Trooper Slusser wanted to search them.

m. Trooper Slusser began searching the vehicle in the front passenger compartment. Inside the shopping bag on the floor was a smaller red zipper bag. Inside this bag, Trooper Slusser observed a gallon sized bag which contained what he immediately recognized as a large amount heroin. Trooper Slusser observed the heroin was mostly contained in amounts of 10 smaller bags (bundle). Trooper Slusser also observed a sandwich baggie inside which contained blue pills which he recognized as Percocet (30mg).

n. Trooper Slusser placed both Herman and Putney under arrest for possession of heroin and trafficking heroin. Both subjects were taken into custody and transported to the Royalton Barracks for processing.

5. I conducted field tests on one bag of the suspected heroin at the Royalton State Police Barracks at approximately 3:12 p.m. The bag of suspected heroin field tested positive for heroin. There were a total of 1212 bags (bindles).

6. According to Tara Tighe, the Interim Director of the Vermont Department of Public Safety Forensic Lab, the lab has reviewed the analysis of 44 separate heroin cases in 2011 and 2014. Tighe states that the average bag weight in these cases is 31.5 mg without packaging. Tighe also states that when one bag of suspected Heroin tests positive for heroin it is reasonable to infer that the remainder of packages contained within that specimen will also contain heroin. According to Tighe's findings the total approximate weight of 1212 bags of heroin is 38,178

milligrams or 38.178 grams. A copy of Tighe's affidavit indicating this information is attached
and incorporated as part of this affidavit.

7. The heroin seized from Putney's vehicle was sent to the VT Forensics Lab for further
testing. Based on my training and experience, I am aware that the average price per bag of heroin
in VT is $20.00 which would mean the street value for the total amount of heroin bags would be
approximately $24,240.00.

8. The blue pills (imprint K9) were identified by VSP as oxycodone 30 mg. From my
training and experience, I recognized them as consistent with the appearance of Percocet 30 mg
tablets I had encountered in other cases. The benchmark unlawful dosage for oxycodone listed
by the VT Board of Health is 20 mg. Based on my training and experience, I am aware that a
common street value for Percocet is approximately $1 per 1 mg, making the value of these pills
over $4,000.00.

9. At approximately 4:18 pm, I conducted an interview of Francis Putney at the Royalton
State Police Barracks. I began the interview by providing Putney with his Miranda warnings.
Putney agreed to speak with me. During the course of the interview, Putney provided the
following relevant information:

a. Putney worked at Putney's Garage and has never been arrested, having only a few
traffic violations.

b. He identified the passenger in the vehicle as Greg Herman. He met Herman
approximately a year ago through a mutual friend.

c. Putney indicated he often provided rides to Herman in exchange for gas money.

d. Putney acknowledged being a regular user of heroin and admitted he had experimented
with other drugs in the past. He indicated he had used two bags of heroin that morning by

6

snorting it. He also indicated he swallowed or snorted Percocets. He described his habit as a 10-15 bag per day habit which has persisted for the past 6-8 months.

e. Putney indicated he has picked Herman up once previously from the bus station in White River Junction and has twice taken him to the bus station. He was also aware that Herman sometimes got rides to Vermont. Putney would pick Herman up when he arrived in Vermont and then drive him around.

f. Putney indicated at first that he assumed Herman was selling drugs when he came to Vermont and later stated he knew Herman was selling drugs in Vermont. Putney stated he assumed Herman brought large quantities of narcotics with him, often including a gallon-sized zip lock bag full of heroin.

g. Putney indicated he was in debt to Herman for approximately $400-$500 for heroin. Putney said Herman would front him 2-3 bundles (20-30 bags) of heroin which Putney would sell to feed his own habit.

h. Putney provided the street names of "Fats" or "Fatty" for Herman.

i. Putney said in the past Herman had brought heroin in bags that were blue, red, or white with red checkers.

10. From my experience with the Northeast Drug Task Force, I had previously received information that heroin was being sold from the Putney Garage.

Dated at Burlington, in the District of Vermont, this $\underline{16^{th}}$ day of April, 2015.

_____
Charles Winn
Trooper, Vermont State Police
Northeast Drug Task Force

Sworn to and subscribed before me this $\underline{16^{th}}$ day of April, 2015.

_____
John M. Conroy
U.S. Magistrate Judge

8